319 So.2d 543 (1975)
EVERGREEN PLANTATION, INC., et al., Plaintiffs-Appellants,
v.
Simon ZUNAMON, Defendant-Appellee.
No. 12670.
Court of Appeal of Louisiana, Second Circuit.
September 3, 1975.
Rehearing Denied October 1, 1975.
*545 Hebert & Moss by Donn Moss, Clint Adcock, Baton Rouge, for plaintiffs-appellants.
Sevier, Yerger & Sevier, by Henry C. Sevier, Jr., Tallulah, Chaffe, McCall, Phillips, Toler & Sarpy, by Leon Sarpy, New Orleans, for defendant-appellee.
Before BOLIN, HALL and DENNIS, JJ.
En Banc. Rehearing Denied October 1, 1975.
DENNIS, Judge.
This is a suit to invalidate a sale of timber for lesion beyond moiety.
Evergreen Plantation, Inc., hereafter "Evergreen", conveyed to Chicago Mill & Lumber Co., a Delaware Corporation, hereafter "Chicago Mill Corporation", in a written contract dated June 8, 1962, for the consideration of $60,000 cash, the right to cut and remove merchantable timber from 8000 acres of land in Tensas parish. Merchantable timber was defined in the agreement as all timber measuring ten inches or more in diameter at a point twelve inches from the ground and all timber which would grow to that size during the next twenty years. On June 29, 1965 Chicago Mill Corporation conveyed all its assets, including the timber cutting contract, to Simon Zunamon.
On March 19, 1965 Evergreen agreed to sell the land on which this timber estate is located to I. W. Osborne and D. D. Wood. These two individuals on March 12, 1966 assigned their rights under this contract to Winterquarters Hunting and Fishing Club, Inc. On June 7, 1966, Evergreen and Winterquarters Hunting and Fishing Club, Inc. brought this suit to set aside the timber sale, alleging that Zunamon was the mere nominee of former stockholders of Chicago Mill Corporation, and contending that the price given by the corporation was less than 1/2 the value of the thing sold. The case has been before this court on 3 previous occasions. On March 22, 1967 we affirmed the trial court's judgment dissolving a writ of attachment and remanded the case to the district court for further proceedings. Evergreen Plantation, Inc. v. Zunamon, 197 So.2d 398 (La.App., 2d Cir. 1967). On January 9, 1973, this court reversed the district court's dismissal of plaintiffs' suit for lack of prosecution and remanded the case to the trial court. Evergreen Plantation, Inc. v. Zunamon, 272 So.2d 414 (La.App., 2d Cir. 1973). A judgment sustaining defendant's exceptions of no cause of action, no right of action and liberative prescription was reversed on January 8, 1974 and the case was remanded for trial. Evergreen Plantation, Inc. v. Zunamon, 291 So.2d 414 (La.App., 2d Cir. 1974).
After a trial on the merits, the district court rendered judgment rejecting the plaintiffs' demands to set aside the timber sale and awarded defendant expert witness fees. In his dictated reasons for judgment, the trial judge found that Zunamon's principals were third party purchasers, without fraud or bad faith, and that plaintiffs had not borne the burden of proving that the value of the timber sold twice exceeded the *546 price given. Plaintiffs appealed assigning as error each of these findings, as well as the determination of expert witness fees below. For the reasons hereinafter stated, we amend the trial court judgment as to the expert witness fees and, as amended, affirm.
There is little factual dispute relating to whether Zunamon acted for bona fide third party purchasers in acquiring the timber cutting contract. Early in 1965, 1,790 of the stockholders of Chicago Mill Corporation held 508,365 outstanding shares of the corporation. The Pritzker and Gonyea families, either through various trusts for their benefit or corporations owned by them, controlled 209,747 of these shares. This amounted to control by these families of 41.26% of the outstanding shares of the corporation.
On February 4, 1965 certain members of the Pritzker and Gonyea families entered a partnership in the state of Illinois, named Chicago Mill and Lumber Company, hereinafter referred to as "Chicago Mill Partnership", for the purpose of acquiring the assets of the Chicago Mill Corporation and operating the business conducted by it. On March 10, 1965, the stockholders of Chicago Mill Corporation formally approved a sale of substantially all the corporate assets to Simon Zunamon, who was acting as nominee for the Chicago Mill Partnership. The sale was consumated on June 29, 1965 for a cash price of $20,334,600 and the assumption by the purchasers of the corporation's liabilities. The cash price, amounting to $40 per share, was deposited in an escrow account for the benefit of all stockholders. Thereafter, on August 13, 1965, the Chicago Mill Corporation was formally dissolved pursuant to an order of approval entered by the United States District Court for the Northern District of Illinois. Zunamon continued to hold title to various assets, including the timber cutting contract, as nominee for Chicago Mill Partnership, which took over the business previously conducted by Chicago Mill Corporation with very little change in organization, employees or methods of operation.
Plaintiffs acknowledge the well settled rule that an action in lesion beyond moiety cannot succeed against a third party purchaser unless fraud or bad faith is proved. Morgan v. O'Bannon & Julien, 51 So. 293, 294 (1910); Brewster Development Company, Inc. v. Fielder, 271 So.2d 299 (1972); O'Brien v. LeGette, 254 La. 252, 223 So.2d 165 (1969). However, they contend that the Pritzker and Gonyea family members who formed the Chicago Mill Partnership should be regarded as the same person under the law as the Chicago Mill Corporation, and not as third persons purchasing from the corporation. Moreover, the plaintiffs impliedly urge us to overlook the fact that the timber cutting contract was not acquired by the Pritzker and Gonyea family members as individuals but by the Chicago Mill Partnership of which they are members.
Conceding, without deciding, that we could disregard the legal distinction between the Chicago Mill Partnership and its individual members for purposes of reaching them in this action for lesion, the facts of this case and the authorities compel us to conclude that these persons were not the alter-ego of the Chicago Mill Corporation and that the distinction between them as persons and the corporate entity must be respected. This court stated the criteria for looking beyond the corporation to the individual stockholder in Texas Industries, Inc. v. Dupuy & Dupuy Developers, Inc., 227 So.2d 265, 268 (La.App., 2d Cir. 1969):
"* * * For the doctrine of an alter ego to apply, it must be shown that the stockholder whose individual and personal liability for a corporate debt is sought disregarded the entity of the corporation and, thus, made the corporation a mere agency for the transaction of his own private business. . . ."
As to when such a situation exists, the Louisiana Supreme Court said in Keller v. *547 Haas, 202 La. 486, 12 So.2d 238, 240 (1943):
"It is well settled that where an individual forms a corporation of which he is the sole and only stockholder or owns such control of the stock that the act of the corporation is his own, then he may not use the screen of corporate entity to absolve himself from responsibility. . . ."
An examination of the record reveals no evidence indicating that the interest controlled by the Gonyea and Pritzker families exercised the extent of corporate control contemplated by the foregoing cases. They were minority stockholders of the corporation. The evidence reflects that 398,164 of the corporate shares were voted in favor of the dissolution and only 38,976 were voted against the dissolution. The federal court in Illinois determined that the price paid to the shareholders by the purchasers of the assets of the corporation was a fair price. There was absolutely no evidence that the Gonyea and Pritzker shareholders instigated or participated in the dissolution of the corporation or the purchase of its assets for the purpose of defeating plaintiffs' action for lesion beyond moiety.
Furthermore, as clearly indicated by our recitation of the facts, there is no evidence in the record which would support a finding of fraud or bad faith on the part of the former stockholders of the Chicago Mill Corporation. Therefore, the Gonyea and Pritzker family members must be considered as third person purchasers in good faith. Consequently, the action to set aside the sale based on lesion cannot be successfully pursued against them or their nominee, even if Zunamon is considered their nominee rather than the nominee of the partnership.
Evergreen, nevertheless, contends that the plaintiff may prevail against Zunamon and Chicago Mill Partnership in this proceeding because in the purchase agreement and the certificate of dissolution of the corporation they agreed to assume all liabilities of the Chicago Mill Corporation. We have serious doubt that the parties to those agreements intended for Zunamon or the partnership to become responsible for a contingency such as the setting aside of a sale for lesion, particularly since the original vendee cannot be held responsible for a return of the property after it has been transferred to a third party.[1] However, we will pretermit any decision on this issue, because our review of the evidence convinces us the original vendee could not have been compelled to return the property in any event.
Plaintiffs presented one expert witness who had made a timber cruise in 1968 of the land subject to the timber cutting contract. He estimated that the 8,000 acre tract contained 4,850 acres of forest land. By assuming that the timber on the land yielded an annual growth of 7½%, which his experience indicated was applicable, he calculated that 3,590,000 board feet of merchantable sawtimber stood on the land at the time of the contract; that this stand of timber would produce 15,500,000 board feet of sawtimber by the year 1981, leaving one year of the 20 year contract to remove the timber; that the value of the timber cut in the final year of the contract would be $387,500 based on 1962 prices; and that the value of this 20 year contract was $147,303 in 1962. In reaching his estimation of the 1962 value, plaintiff's expert simply discounted his estimated 1981 value by 5% per annum.
Defendants presented two expert witnesses who had actually cruised the timber and made appraisals. The first made his *548 cruise in 1961. He estimated that 4,020 acres of forest land were covered by the contract and that in 1961 the land contained 3,846,000 board feet of merchantable sawtimber of various species. Assigning the appropriate 1961 market value to each species of timber, he computed the average value of all species to be $17.58 per thousand board feet. The total projected volume in 1982 was determined to be 10,520,340 board feet by applying an unspecified growth factor. By multiplying this average 1961 value by the projected volume in 1982 and dividing that figure by the total acreage in forest, he arrived at the value per acre in 1982. He then discounted this value per acre back to 1961 at 3% per annum to determine that the value per acre in 1961 was $25.47. The total value was then calculated for the 4,020 acres to be $102,389.40. After making deductions for the expense of managing the timber land and for the risk of loss through natural hazards, this witness assessed the value of the timber cutting contract to be $61,000.
Defendant's second expert made his cruise in 1967. He estimated the size of the forest land area to be 5,737 acres. From core samples taken out of trees during the timber cruise, he arrived at growth rates for six different species of trees. Using these growth rates, he calculated that 3,881,000 board feet of merchantable sawtimber stood on the land in 1962; that 15,289,000 board feet of merchantable sawtimber would be present by 1982; that the net value of this timber in 1982, at 1962 prices, would be $278,611; that the value of this 20 year contract would be $70,423 after applying a discount of 6% per annum for the period covered by the contract and after deducting appropriate managerial expenses.
The principal differences between the plaintiffs' expert and the defendant's appraisers lay in the manner in which the estimated expenses of cutting and removing the timber scattered over the land were assessed and applied, in their estimates of the amount and value of pulpwood found on the property, in the proper 1962 values to be assigned to the timber, and in the proper weight to be given the risk of timber damage or failure of timber growth on the land which was located on the unprotected side of the Mississippi River levee.
The trial judge stated in his reasons for judgment that he was more favorably impressed with the testimony of defendant's experts and based his decision primarily on this ground. Plaintiffs complain that he ignored the testimony of one employee of Chicago Mill Partnership with respect to a letter in which he expressed the opinion that the value of the timber cutting contract was $177,000 in 1966. However, much less weight should be assigned to his opinion because it was expressed in connection with negotiations to sell the contract, four years after the contract date, by an employee who was not an expert timber appraiser and had not cruised the timber. The same may be said of defendant's evidence consisting of the book value assigned the timber for accounting and tax purposes by Evergreen's accountant.
Considering that the most reliable evidence of value was the testimony of the appraisers, that the assessment of their testimony by the trial judge who saw and heard them is entitled to great respect, and that the burden of proof required to rescind a sale on the ground of lesion beyond moiety is a very heavy one, Foos v. Creaghan, 226 La. 619, 76 So.2d 907 (1954); White v. Bergstedt, 164 La. 993, 115 So. 59 (1927); Hyde v. Barron, 125 La. 227, 51 So. 126 (1909), we find no manifest error in the district court's refusal to set aside the timber cutting contract.
Two of defendant's expert witnesses presented bills for their services, and the trial judge awarded the defendant fees in the full amount of their statements. Their bills contained many items for which they were not entitled to be compensated, and we consider the awards excessive.
*549 Barton Bennett, one of defendant's experts, who based his testimony on a timber cruise conducted by a timber consulting firm of which he was a member, presented a bill for $14,052.35. He stated that he personally expended 8½ days in connection with the cruise and his testimony in court. He testified that his father and other employees of the firm spent 30 man days on the timber appraisal. The evidence shows that Bennett and members of his firm had to devote more time and incur more expenses than ordinarily required in the appraisal of immovable property. In view of these unusual circumstances we award an expert witness fee of $3,500 to Bennett as compensation for his time and expenses in preparing for trial, and for testifying at the trial. Compare, State v. Donner Corporation, 236 So.2d 841 (La.App., 3d Cir. 1970).
Dr. Kenneth Davis, a retired professor of forestry, last associated with Yale University, and author of texts on forest management, presented a bill for $1,966.65. However, he did not cruise the property or appraise the timber. His testimony consisted of an evaluation of the methods employed by Barton Bennett and his associates in cruising and appraising the timber. Davis expended four days in traveling to the court, waiting to give, and giving his testimony. In view of the time employed, and the degree of learning or skill required, we award him a fee of $750 in connection with his appearance.
For the reasons herein assigned, the judgment appealed from is amended by reducing the amount allowed as expert witness fees for Barton Bennett from $14,052.35 to the sum of $3,500; and by reducing the amount allowed as expert witness fees for Dr. Kenneth Davis from $1,966.95 to the sum of $750. In all other respects the judgment appealed from is affirmed. The costs of this appeal are assessed to plaintiffs-appellants.
Amended and affirmed.
NOTES
[1] The action for return of the property is not to be confused with the action instituted by a former vendor against his vendee for a deficiency in price after the property has been sold to a third party. O'Brien v. LeGette, 223 So.2d 165 (1969). We are not here concerned with the latter action.